UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
FRANK McCLARIN,                                          :
                                                        :
                                Petitioner,             :
                                                        :            **OPINION & ORDER**
        -against-                                       :            05-CV-2478 (DLI)
                                                        :
JOSEPH T. SMITH, Superintendent,                        :
Shawangunk Correctional Facility,                       :
                                                        :
                                Respondent,             :
-----------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Frank McClarin ("McClarin" or "petitioner") was convicted in the New York State Supreme

Court, Kings County, after a trial by jury, of robbery in the second degree (N.Y. Penal Law §

160.10[1]) on October 21, 1999. Petitioner moved the trial court to set aside the verdict pursuant

to New York Criminal Procedure Law § 330.30 on the grounds that the evidence was legally

insufficient to sustain the jury's verdict and that the court's ruling on the *Sirois* hearing was

erroneous. The court denied petitioner's motion on January 31, 2000, and sentenced him on

February 14, 2000 to a prison term of sixteen years to life as a persistent violent felony offender.

The Appellate Division of the New York State Supreme Court, Second Department, affirmed

the judgment on November 18, 2002. *See People v. McClarin,* 299 A.D.2d 495, 749 N.Y.S.2d 884

(2d Dep't 2002). On January 31, 2003, the New York Court of Appeals denied petitioner's leave

to appeal. *See People v. McClarin,* 99 N.Y.2d 583, 755 N.Y.S.2d 719 (2003).

On September 22, 2003, petitioner moved to set aside his sentence pursuant to New York

Criminal Procedure Law § 440.20. On November 28, 2003, the Kings County Supreme Court

denied petitioner's motion. On August 18, 2004, the Appellate Division of the New York State

1

Supreme Court, Second Department, denied petitioner's application for leave to appeal. On June 29, 2004, petitioner moved to vacate the judgment of conviction on the ground of ineffective assistance of counsel based on counsel's waiver of petitioner's presence while the trial court announced additional findings regarding the *Sirois* hearing. Petitioner also alleged that the trial court denied him due process of law when it failed to inquire of him whether he waived his right to be present. The Kings County Supreme Court denied petitioner's motion on August 30, 2004, finding petitioner's claims to be procedurally barred pursuant to New York Criminal Procedure Law §§ 440.10(2)(a) and (2)(c). On February 4, 2005, the Appellate Division of the New York State Supreme Court, Second Department, denied petitioner's application for leave to appeal.

On May 10, 2005, petitioner filed the instant petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the petition is denied.

### Background

On the evening of November 28, 1998, at approximately 9:00 p.m., at Montauk and Pitkin Avenues in Brooklyn, New York, two men, petitioner and an unapprehended accomplice, approached Francisco Rosa Vargas. (Vargas: 184-85, 188, 208-09; Morales: 227-28.)[1] Vargas's rendition of the events that followed differed during his testimony before the grand jury and his testimony at trial. Before the grand jury, Vargas testified that both men produced handguns, one man putting a gun to his neck, and the other putting a gun to his stomach. (Vargas: 208-09; Morales: 228, 232.) He further testified that the men took his jacket, beeper, watch, ring and some money, and that

_____

[1]Page references without prefix refer to pages of the minutes of the trial. (Resp.'s Ex. B.) The names preceding the numbers refer to the witnesses whose testimony is cited. Page references preceded by "S" refer to pages of the sentencing minutes. (Resp.'s Ex. C.) Finally, page references preceded by "VD" refer to the voir dire minutes. (Resp.'s Ex. A.)

petitioner told him that if he called the police, petitioner would kill him.  (Vargas:  208-10; Morales:  228-29, 231-33.)  However, at trial, Vargas testified that, although petitioner had been present during the robbery with what appeared to be a pistol, petitioner did not participate in the robbery.  (Vargas:  184-93, 206-07.)  Rather, petitioner's unapprehended accomplice alone pointed the gun at Vargas, took his property, and told Vargas not to call the police.  (*Id*.)  Specifically, Vargas testified at trial, "there were two [men involved] but the other one was the one that took off everything from me . . . [petitioner] was there but the other one was the one who committed [the robbery]."  (Vargas:  184, 186.)  The robbers fled together on foot.  (Vargas:  193.)

Immediately thereafter, Vargas flagged down Lieutenant Pablo Martinez and Officer Noreen Potvin, who were patrolling in an unmarked car.  (Potvin:  24-25; Martinez:  78-80.)  Vargas told the officers, primarily in Spanish, that he had been robbed, and described the robbers as two black males, twenty to thirty years old, approximately five feet eight or nine inches tall, one with short hair, glasses and a mustache, the other with shoulder-length hair in braided curls, wearing a dark jacket and jeans.  (Potvin: 25-29, 51-52, 54; Martinez: 81-83, 95, 101-02; Vargas: 183-84, 195-96.)  Officer Potvin's memo book described only a "male, light-skinned with glasses," while Martinez's memo book contained no descriptions.  (Potvin:  54-55; Martinez:  102.)

After canvassing the area in the police officers' car for approximately ten to fifteen minutes, Vargas saw two men standing together in front of the entrance to the subway station at Pitkin and Shepherd Avenues and identified them as the robbers.  (Potvin:  31-36, 54-56; Martinez:  83-86; Vargas:  196-97.)  The man later identified as petitioner had shoulder-length braided hair and was wearing a brown leather jacket, blue jeans and work boots.  (Potvin:  34-35, 50; Martinez:  84-85, 98.)  The other man had short hair and glasses and was wearing a bright colored jacket with dark pants.

(Potvin: 35; Martinez: 85, 95.)  Both men were approximately five feet eight inches tall.  (Potvin: 35, 49.)  As the police exited the car, the man with the glasses ran into the subway and was pursued by Officer Potvin, while petitioner backed away and threw a beeper and a watch to the ground.  (Potvin:  31-36, 56-57; Martinez: 86-89, 96-98, 114-15, 122.)  Officer Potvin emerged from the subway station alone, and both officers handcuffed petitioner.  (Potvin: 37-38, 60-62; Martinez 88-89, 114.)  Lieutenant Martinez retrieved the beeper and the watch that petitioner had thrown to the ground, as well as a jacket and pellet gun from the subway.  (Martinez: 89-92, 115-16.)  Vargas identified the watch, beeper and jacket as some of the property that had been taken from him, and the pellet gun as one of the guns used in the robbery.  (Vargas: 200-02; Martinez: 230-31.)  No other guns were recovered at the scene, and the man with the glasses was never apprehended.  (Potvin: 59-60, 63; Martinez:  117-19.)

Petitioner was charged with robbery in the first degree (N.Y. Penal Law § 160.15[4]), two counts of robbery in the second degree (N.Y. Penal Law § 160.10[1], [2][b]), and lesser related offenses.

*Relevant Events at Petitioner's Trial*

1.    *Sirois* Hearing[2]

On the second day of the trial, before Vargas testified, the prosecutor advised the court that petitioner had approached Vargas on at least three occasions, had apologized to Vargas, and had implored him not to testify against him at trial.  (128-29.)  The prosecutor also noted that these

---

[2] A *Sirois* "hearing [is] held in New York criminal cases to determine whether the defendant has procured a witness's absence or unavailability through his own misconduct, and thereby forfeited any hearsay or Confrontation Clause objections to admitting the witness's out-of-court statements."  *Cotto v. Herbert,* 331 F.3d 217, 225-26 (2d Cir. 2003) (citing *People v. Geraci,* 85 N.Y.2d 359, 363 n. 1, 625 N.Y.S.2d 469 (1995)).

contacts might be in violation of a judicial order of protection. (129-30.) The prosecutor then requested a hearing outside the presence of the jury to determine whether petitioner had made admissions to Vargas that could be admitted into evidence at trial. (130.) Defense counsel concurred in the prosecutor's request, and the court granted the hearing. (132-33.)

At the hearing, Vargas testified that petitioner had approached him on two or three occasions since the robbery. (Vargas: 137, 140.) The first contact occurred approximately five months after the robbery at Pitkin Avenue and Milford Street in Brooklyn, while Vargas was sitting in a parked car. (Vargas: 202.) Petitioner told Vargas, "Popi, I was on drugs, heroin and crack, I am sorry, you know, it was like a misunderstanding, I was not into that." (Vargas: 137.) Petitioner also said that he did not have anything to do with the robbery, and begged for Vargas's help. (Vargas: 143.) Vargas told petitioner there was "no problem," to which petitioner said thank you and walked away. (Vargas: 143-44.) The second contact occurred three days before Vargas testified at the hearing at a McDonald's restaurant on Atlantic Avenue in Brooklyn. (Vargas: 137-39, 140.) Petitioner said to Vargas, "Popi, excuse me, no problem, excuse me, I am sorry, no I was on drugs, it was like I was on drugs when that took place." (Vargas: 138.) Petitioner asked Vargas to help him and that he had repented. (Vargas: 144.) Vargas told petitioner there was no problem, petitioner said thank you and left. (*Id*.) Vargas testified at the hearing that on one of these occasions, petitioner had asked Vargas not to testify against him in court. (Vargas: 138-39.) Vargas further testified that he had seen petitioner in the courthouse hallway immediately prior to his testimony, but denied that he had seen anyone sitting with petitioner, or that anyone had gestured toward or threatened Vargas or had asked Vargas not to testify. (Vargas: 141.) Vargas was unaware of an order of protection against petitioner, and did not remember the third contact. (Vargas: 140-41, 145.)

The court took judicial notice that an order of protection had been issued directing petitioner to stay away from Vargas, and found that petitioner had violated the order of protection by speaking to Vargas. (Vargas: 146, 155.) The court also noted that Vargas had been "terrified" during his hearing testimony, and found petitioner responsible for that his fear. (Vargas: 152, 155.) Ultimately, the court ruled that petitioner's statements to Vargas contained admissions and that Vargas would be allowed to testify about them during the prosecution's case. (Vargas: 146-47.) Specifically, the court stated:

> After having heard the witness and considering the prejudicial value and the relevance of the testimony, I am finding that I will allow it. It seems to me that these are admissions by the defendant and as such they are admissible and any prejudicial value I think is overcome by the probative value. I am not talking about the fact that I am satisfied that the defendant did approach Mr. Vargas and did say the things that Mr. Vargas just testified to so on that basis I will allow the questioning on direct regarding the conversation between the defendant and Mr. Vargas.

(Vargas: 147.) The court further ruled that the prosecution would be allowed to impeach Vargas's trial testimony with Vargas's grand jury testimony. (Vargas: 152-55.) Characterizing the earlier hearing as a "pseudo-*Sirois* [sic] hearing," the court decided to treat Vargas's prior hearing testimony as part of the *Sirois* hearing, to take further testimony from Vargas to "complete the hearing," and to allow the defense to cross-examine Vargas. (162-63.)

Thereafter, Vargas testified that he did not feel presently threatened by petitioner, nor had he felt threatened during the two occasions petitioner had approached him before trial. (Vargas: 164-65.) Rather, Vargas testified that he felt sorry for petitioner because, on the first occasion, petitioner had appeared weak and cried and, on the second occasion, petitioner had walked with a cane, knelt before Vargas, and pleaded with Vargas to help him. (Vargas: 164-66.)

The prosecution then called Detective Investigator Efraim Alvarado of the Kings County

District Attorney's Office. (Alvarado: 167.) Alvarado testified that, on the morning of the hearing, he was assigned to bring Vargas to the District Attorney's Office to meet with the prosecutor. (Alvarado: 168.) Although Vargas had displayed an unwillingness to testify in the beginning of that meeting, it was "not much." (Alvarado: 172.) However, Vargas told Alvarado that he was "afraid to testify while Mr. McClarin was in the courtroom." (Alvarado: 172.)

Alvarado accompanied Vargas to court, seating him on a bench outside the courtroom. (Alvarado: 171.) Petitioner was seated next to Vargas, and there were several other individuals in the hallway. (Alvarado: 171, 173-76.) Vargas's demeanor changed because "[h]e was afraid, he thought the individuals that were outside were here to see the defendant." (Alvarado: 172.) He told Alvarado, "cuff me right now, I am not going to testify, I don't want to, I really don't want to testify." (*Id*.) When the prosecutor came out into the hallway, Vargas stated that he was going to testify that McClarin had been present at the time of the robbery, but did not participate in it. (Alvarado: 177.)

The trial then resumed with Vargas's testimony. As recounted above, Vargas testified, contrary to his grand jury testimony, that petitioner had been present but had not participated in the robbery. (Vargas: 184-93, 206-07.) The court, discounting the testimony about the other individuals in the hallway, ruled that based on "all the evidence I had heard this morning, I think there is a *Sirois* [sic] problem here and you will be allowed to read the Grand Jury testimony to the jury," and that it was satisfied "the defendant actively consciously participated in threatening this defendant [sic]." (177-78.) The basis for the court's decision was "the witness, testimony that I heard and his conduct today convinced me that the man feels threatened." (180.) The prosecutor then used Vargas's grand jury testimony to impeach the credibility of Vargas's trial testimony. (Vargas: 207-10.)

The court remanded petitioner following Vargas's testimony. (211-12.) After lunch, but before petitioner entered the courtroom, the court made additional *Sirois* findings. (212-13.) Defense counsel waived petitioner's presence. (212.) The court stated that it had observed Vargas's demeanor and was convinced that Vargas had been in great fear during his testimony. (*Id.*) The court held that even if petitioner had not threatened Vargas, the logic of *Sirois* would still apply because petitioner had asked the witness for sympathy. (212-13.) The court further held that the prosecutor would be allowed to have Vargas's grand jury testimony read into evidence and considered by the jury as direct evidence of petitioner's guilt. (213-17.) Vargas's grand jury testimony was subsequently admitted into evidence and read to the jury. (Morales: 227-33.)

2.      The Prosecution's Summation

On summation, the prosecutor primarily sought to establish that Vargas's grand jury testimony more accurately described the events that transpired on November 28, 1998. The prosecutor began by framing the issue as whether petitioner had a "role in that robbery," and if so, "whether he participated . . . to such a degree as to expose him to criminal liability." (280-81.) The prosecutor then detailed the differences between Vargas's grand jury testimony and his testimony at trial, and invited the jury to question why such differences exist. (281-83.) In outlining for the jury why it should believe Vargas's grand jury testimony over his testimony at trial, the prosecutor first asserted that, contrary to defense counsel's contention, Vargas had no problem understanding the grand jury interpreter. (284-85.) Second, the prosecutor argued that the differences between the two accounts given by Vargas were because petitioner had "reached out to him." (285-93.) Third, the prosecutor noted that Vargas's grand jury testimony occurred closer in time to the robbery and predated petitioner's encounters with Vargas. (293-94.) Finally, the prosecutor reminded the jury

that "we have the defendant's own words . . . the defendant admitted to Mr. Vargas that he was there." (295.) The prosecutor sought to diminish any sympathy the jury members may feel towards petitioner given that he had apologized to Vargas and had begged for his sympathy by arguing that petitioner's apology in fact constituted an admission of guilt. (286-88, 293-7, 310.) In response, the trial court directed the prosecutor to "not . . . touch that area anymore . . . do not go into the question 'I am sorry, I am begging' . . . you covered that enough. Go on to something else." (296-97.)

The prosecutor then countered defense counsel's argument that the evidence corroborated Vargas's trial testimony. The prosecutor argued that Officer Potvin did not write down a description of petitioner in her memo book, even though she wrote a description for the second man, because she had been distracted at the time canvassing the area with Vargas and did not ordinarily record every detail in her memo book. (298-99.) The prosecutor further argued that the description of the perpetrators that Lieutenant Martinez put over the radio contained inconsistencies simply because, unlike Vargas, Lieutenant Martinez is not fluent in Spanish and Vargas had difficulties communicating with him. (299-300.) Finally, the prosecutor argued that inconsistent evidence is not indicative of a conspiracy to frame petitioner. (300-01.)

The trial court sustained defense counsel's objections on several occasions throughout the prosecution's summation. While countering defense counsel's argument that Vargas's differing accounts of what happened created reasonable doubt, the prosecutor told the jury that Vargas said some things at trial that were "not true" because petitioner "made him come here and say those things." (292-93.) The court struck the prosecutor's comment from the record. (293.) The prosecutor then told the jury, "it is like a son who kills his parents and throws himself on the mercy of the Court," to which the court responded, "[s]top this right now, go on to something else." (293.)

The prosecutor continued by asserting that Vargas told "the straight story in the Grand Jury" before petitioner "got to him" and "tainted his testimony at trial." (293-94.) The court struck the word "tainted." (294.)

The court also sustained defense counsel's objection to the prosecutor's argument that Vargas "never denied at trial"that petitioner had a gun. (304-05.) The prosecutor next said, "[h]e never at trial backed away from his Grand Jury . . . ," and the court responded, "I am perfectly capable of discussing the law with the jurors. I ask you to confine yourself to what you think the facts are in this case." (305.) The prosecutor then told the jury that it could convict petitioner of robbery in the second degree even if a real gun was not involved because the man with the glasses was "actually present with [petitioner] while the robbery was committed and we know that is the case because Mr. Vargas testified . . . ." (306.) The court sustained defense counsel's objection, excused the jury, and repeated its prior admonitions to the prosecutor not to discuss the law or tell the jury what he believes the evidence shows. (307.) Defense counsel then moved for a mistrial based on prosecutorial misconduct on summation. (*Id*.) The trial court denied the motion. (*Id*.)

3.     Petitioner's Sentence

Petitioner was sentenced to a prison term of sixteen years to life. (S: 10.) Prior to imposing sentence, the court adjudicated petitioner a persistent violent felony offender based on five prior felony convictions, in accordance with New York Penal Law § 70.08 and New York Criminal Procedure Law § 400.16: (1) an April 24, 1984 conviction of attempted burglary in the second degree, a class D felony (Kings County indictment number 2259/83); (2) a trio of convictions on December 17, 1987 for robbery in the second degree, class C felonies (Queens County indictment numbers 4382/87, 5359/87, and 5318/87); and (3) a September 27, 1995 conviction for attempted

robbery in the second degree, a class D felony (Kings County indictment number 8417/95). (S: 6-8; Resp.'s Ex. W.) Petitioner admitted all five felony convictions, and did not challenge the constitutionality of any of those convictions. (S: 6-8.)

*Procedural History*

On appeal from his judgment of conviction, petitioner, through counsel, argued that: (1) he was denied his right to a fair trial and his right to confrontation by the court's admission of Vargas's grand jury testimony on the prosecution's case-in-chief; (2) the prosecutor had improperly exploited the court's *Sirois* ruling on summation; (3) he was denied his right to be present at all material stages of trial because he was not present when the court made additional rulings regarding the *Sirois* hearing; and (4) his adjudication as a persistent violent felony offender was in violation of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). In affirming petitioner's judgment of conviction, the Appellate Division found:

> Contrary to the defendant's contention, the evidence presented at the Sirois hearing (*see Matter of Holtzman v. Hellenbrand,* 92 A.D.2d 405, 415, 460 N.Y.S.2d 591) was sufficient to support the Supreme Court's determination, under the clear and convincing evidence standard, that the defendant's misconduct caused the complainant to alter his trial testimony . . . Accordingly, the Supreme Court properly allowed the prosecution to use the complainant's Grand Jury testimony as part of its direct case. The defendant's remaining contentions are either unpreserved for appellate review or without merit.

*McClarin,* 299 A.D.2d at 495. The Court of Appeals denied petitioner's application for leave to further appeal his criminal conviction. *McClarin*, 99 N.Y.2d at 583.

On September 22, 2003, petitioner moved in the Kings County Supreme Court to set aside his sentence pursuant to New York Criminal Procedure Law § 440.20. Petitioner claimed that his sentence was illegal pursuant to New York Penal Laws §§ 70.08 and 70.04(b), on the ground that

the court had used erroneous and incomplete information in adjudicating him a persistent violent felony offender. Specifically, petitioner argued that his 1984 conviction for attempted burglary was in fact a youthful offender adjudication, and his 1995 conviction for attempted robbery was vacated in 1997. The Kings County Supreme Court denied the motion on November 28, 2003, finding that petitioner's 1984 conviction did not receive youthful offender treatment, and that his probation for his 1995 conviction "was unfavorably terminated," not "vacated and dismissed." (Resp.'s Ex. L.) The Appellate Division denied petitioner's application for leave to appeal the denial of the § 440.20 motion on August 18, 2004. (Resp.'s Ex. O.)

On June 29, 2004, petitioner moved, pursuant to New York Criminal Procedure Law § 440.10, to vacate his judgment of conviction on the ground of ineffective assistance of counsel based on counsel's waiver of petitioner's presence while the trial court announced additional findings regarding the *Sirois* hearing. The Kings Country Supreme Court denied petitioner's motion finding petitioner's claims procedurally barred pursuant to New York Criminal Procedure Law § 440.10(2)(a) and (2)(c). (Resp.'s Ex. R.) The Appellate Division denied petitioner's application for leave to appeal the denial of the § 440.10 motion on February 4, 2005. (Resp.'s Ex. V.)

Petitioner challenges his conviction through the instant petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on the grounds that he was denied: (1) his due process right to a fair trial and his right to confrontation by the court's admission of Vargas's grand jury testimony on the prosecution's case-in-chief, and by the prosecutor's improper exploitation of the court's *Sirois* ruling on summation; (2) due process and his right to be present at all material stages of trial because he was not present when the court made additional rulings regarding the *Sirois* hearing; (3) his right to effective assistance of counsel when counsel waived his presence at the *Sirois* hearing; (4) his right

to a jury trial when the sentencing court adjudicated him as a persistent violent felony offender; and

(5) due process because the sentencing court adjudicated him a persistent felony offender based on

inaccurate and incomplete information.

## Discussion

### I.      Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in State court proceedings.

28 U.S.C. § 2254(d).  A state court "adjudicates" a petitioner's claim "on the merits" when it

"dispose[s] of the petitioner's federal claim on substantive grounds, and reduce[s] that disposition

to judgment.  No further articulation of its rationale or elucidation of its reasoning process is

required." *Brown v. Artuz,* 283 F.3d 492, 498 (2d Cir. 2002) (quoting *Aparicio v. Artuz,* 269 F.3d

78, 93-94 (2d Cir. 2001)).  A decision is "contrary to" clearly established federal law only if "the

state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

law or if the state court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 413, 120 S. Ct. 1495, 146 L. Ed. 2d 389

(2000).  A state court's decision involves an "unreasonable application of" clearly established federal

law when "the state court identifies the correct governing principle from [the Supreme Court's]

decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*  AEDPA

also specifies the applicable standard for federal review of state factual findings: a petitioner must demonstrate that a decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In habeas proceedings, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). It is the petitioner's burden to rebut the presumption of correctness "by clear and convincing evidence." *Id.*

## II. The Confrontation Clause and the Waiver-by-Misconduct Doctrine

### A. Legal Standards

The Confrontation Clause of the Sixth Amendment provides, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. The right of confrontation is a "fundamental right essential to a fair trial in a criminal prosecution," *Pointer v. Texas,* 380 U.S. 400, 404, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965), and is designed to "secure for the defendant the opportunity of cross-examination." *Cotto,* 331 F.3d at 229. As such, the Sixth Amendment generally bars the admission of out-of-court statements not subject to the scrutiny of cross-examination. *Id.*

Despite its constitutional significance, the right of confrontation is not absolute. Indeed, the Supreme Court has held that a defendant's intentional misconduct may, under limited circumstances, result in a waiver of his rights under the Confrontation Clause. *Illinois v. Allen,* 397 U.S. 337, 343, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970). Under such circumstances, a witness's out-of-court statements may be admitted at trial in lieu of his or her live testimony without violating a defendant's right of confrontation. The underlying purpose of the "waiver-by-misconduct" rule is to ensure that the law does not allow a person to take advantage of his own wrong. *U.S. v. Mastrangelo,* 693 F.2d

269, 272 (2d Cir. 1982).

Although it is clear that a defendant may waive his right to confront witnesses, the Supreme Court has yet to clarify the boundaries of the "waiver-by-misconduct" rule. In the State of New York, the prosecution may "allege specific facts that demonstrate a distinct possibility that the criminal defendant's misconduct has induced a witness' unlawful refusal to testify." *Holtzman v. Hellenbrand*, 92 A.D.2d 405, 415, 460 N.Y.S.2d 591 (2d Dep't 1983) (formulating requirements for *Sirois* hearing). If the trial court finds that the prosecution has presented clear and convincing evidence that the defendant's misconduct caused the witness's unlawful refusal to testify, the defendant will be found to have waived his confrontation rights, and the witness's prior grand jury testimony may be admitted. *Id.*; *see also Geraci,* 85 N.Y.2d at 366 ("out-of-court statements, including Grand Jury testimony, may be admitted as direct evidence where the witness is unavailable to testify at trial and the proof establishes that the witness's unavailability was procured by misconduct on the part of the defendant."). Within the Second Circuit, however, the prosecution need only prove by a preponderance of the evidence that the defendant was responsible for a witness's unavailability. *Mastrangelo,* 693 F.2d at 272. Therefore, the issue is whether the prosecution met the preponderance of the evidence standard required in the Second Circuit, or the more exacting clear and convincing evidence standard required in the State of New York. *Id.*; *see also La Torres v. Walker,* 216 F. Supp. 2d 157, 166 (S.D.N.Y. 2000) (a court's "finding of admissibility [after a *Sirois* hearing applying New York's higher standard], . . . if correct, would also satisfy the constitutional standard.").

### B.    Admission of Vargas's Grand Jury Testimony at Trial

Petitioner contends that his writ of habeas corpus should be granted because the trial court

denied him due process and the right of confrontation by admitting Vargas's grand jury testimony. Specifically, petitioner agues that the trial court's finding that petitioner threatened Vargas was an unreasonable determination of facts in light of the evidence presented at the *Sirois* hearing, and that the trial court's ruling that petitioner's pleas for sympathy were misconduct constituting a waiver of his right to confrontation was erroneous and contrary to clearly established federal law. The determination of the trial court that petitioner caused Vargas to alter his trial testimony through his pleas for sympathy on two separate occasions is a factual determination entitled to a presumption of correctness. *See Cotto,* 331 F.3d at 232. "Thus, it may be overturned on habeas review only if: (1) [] petitioner presents clear and convincing evidence that the court erred in its determination or (2) it was based on an unreasonable application of the facts." *Francis v. Duncan,* No. 03 Civ. 4959, 2004 WL 1878796, at *18 (S.D.N.Y. Aug. 23, 2004) (citing 28 U.S.C. § 2254(e)(1); 28 U.S.C. § 2254(d)(2)). Deference to the trial court's fact-findings is particularly important when considering witness credibility. *Cotto,* 331 F.3d at 233 (citing *Sanna v. Dipaolo,* 265 F.3d 1, 10 (1st Cir. 2001)).

Petitioner first raised this argument on appeal. The Appellate Division found that the trial court properly allowed the prosecution to use Vargas's grand jury testimony as part of its direct case because "the evidence presented at the *Sirois* hearing was sufficient to support the Supreme Court's determination, under the clear and convincing evidence standard, that the defendant's misconduct caused the complainant to alter his trial testimony." *McClarin,* 299 A.D.2d at 495. Respondent contends that the Appellate Division's decision was neither an unreasonable application of clearly established federal law, nor an unreasonable determination of facts in light of the evidence presented. Rather, it was a reasonable decision, based on a thorough set of factual findings. The court agrees.

First, the record indicates that Vargas altered his grand jury testimony only after having been

contacted by petitioner on two occasions following the robbery. (Vargas: 137-39, 140.) Vargas testified before the grand jury about one week after the robbery that both petitioner and his unapprehended accomplice possessed handguns, one man putting a gun to his neck, and the other putting a gun to his stomach. (Vargas: 208-09; Morales: 228, 232.) He further testified that both men took property away from him, and that petitioner told him that if he called the police, petitioner would kill him. (Vargas: 208-10; Morales: 228-29, 231-33.) It was not until petitioner approached Vargas, begging for his help and asking him not to testify against petitioner in court, that Vargas altered his testimony to say that, although petitioner had been present at the time of the robbery with what appeared to be a pistol, he did not participate in the robbery. (Vargas: 137-39, 143-44, 184-93, 206-07.) Specifically, Vargas testified at trial, "there were two [men involved] but the other one was the one that took everything off from me . . . [petitioner] was there but the other one was the one who committed [the robbery]." (Vargas: 184, 186.)

Second, Vargas's behavior after having been contacted by petitioner indicates that petitioner's pleas for sympathy caused Vargas to alter his grand jury testimony. The court heard testimony from Detective Investigator Alvarado that Vargas displayed an initial unwillingness to testify on the morning of the hearing, particularly if "Mr. McClarin w[ould be] in the courtroom." (Alvarado: 172.) Although Vargas did not indicate to Alvarado why he was afraid, he said that petitioner had "pleaded with him not to testify." (Alvarado: 170.) Alvarado further testified that Vargas's demeanor visibly changed when he was seated on the bench outside the courtroom because he "thought the individuals that were outside were here to see the defendant." (*Id.*) He told Alvarado, "cuff me right now, I am not going to testify, I don't want to, I really don't want to testify." (*Id.*) Vargas then told the prosecutor that he was going to testify that petitioner had been

present at the time of the robbery, but that he did not participate in it.  (Alvarado: 177.)

Although Vargas testified at the hearing that he did not presently feel threatened by petitioner, nor had he felt threatened during the two occasions petitioner had approached him before trial, the court found petitioner to be "terrified," and stated that it "was very impressed by the fact that when [the prosecutor] asked him about the Grand Jury minutes, the testimony, he was visibly shaken and . . . in fear . . . ."  (152-3, 155, 212.)  Moreover, the trial court took judicial notice that an order of protection had been issued directing petitioner to stay away from Vargas, and found that petitioner had violated the order by speaking to Vargas, even though Vargas was not even aware of the order.  (Vargas: 146, 155.)[3]

Petitioner argues that the trial court's determination was unreasonable in light of the evidence presented at the hearing, and therefore not entitled to a presumption of correctness, because it was internally inconsistent and not supported by objective evidence.  The Second Circuit has noted that Section 2254(e)(1)'s "presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."  *Harris v. Kuhlmann,* 346 F.3d 330, 350 (2d Cir. 2003) (quoting *Parsad v. Greiner,* 337 F.3d 175, 181 (2d Cir. 2003)).  Thus, on habeas review, the trial court's decision to credit Vargas's testimony in finding that petitioner's statements contained admissions, while discrediting Vargas's testimony that petitioner was "begging for sympathy," is entitled to substantial weight.  (Vargas: 146-47, 152, 155, 212-13.)  In any event, the trial court made

---

[3]Petitioner additionally claims: the court's finding that merely violating the order of protection constituted a *Sirois* waiver was erroneous.  (Pet.'s Suppl. Br. at 26.)  However, as petitioner concedes, the court did not rely solely on petitioner's violation of the order of protection in finding that the prosecution had established by clear and convincing evidence that petitioner's misconduct caused Vargas to alter his trial testimony.  (*Id*.)  Rather, the court merely took judicial notice that the order had been issued, and mentioned petitioner's violation of it as one of the many factors supporting its decision.

clear that even if petitioner was "using sympathy . . . I think the *Sirois* [sic] principle would have been violated." (213.) Moreover, petitioner's speculative assertions that Vargas's fear during his testimony at the *Sirois* hearing may have been due to the other individuals in the courthouse hallway or the thought of being arrested for perjury, fail to rebut the "presumption of correctness" by clear and convincing evidence.

Thus, the court finds that the objective evidence and the reasonable inferences arising therefrom support the trial court's findings that (1) Vargas only altered his grand jury testimony after petitioner approached him on the two occasions, (2) either petitioner's request of Vargas not to testify or his pleas of sympathy caused Vargas to alter his testimony, and (3) Vargas was in great fear during his testimony at trial. As such, the trial court's determination that the prosecution proved by clear and convincing evidence that petitioner's intentional conduct procured Vargas's altered testimony was not unreasonable in light of the evidence presented.

Petitioner further argues that the evidence in this case, namely petitioner's pleas for sympathy, is considerably less direct than that previously deemed sufficient to constitute a forfeiture of confrontation rights in prior cases within the Second Circuit and other circuits. Indeed, confrontation rights may only be waived by a defendant through a "knowing and intentional relinquishment." *Cotto,* 331 F.3d at 234; *see also Brookhart v. Janis,* 384 U.S. 1, 4, 86 S. Ct. 1245, 16 L. Ed. 2d 314 (1966) ("There is a presumption against the waiver of constitutional rights, and for a waiver to be effective it must be clearly established that there was an intentional relinquishment or abandonment of a known right or privilege.") (internal quotation marks and citations omitted). Petitioner cites to the Seventh Circuit's decision in *U.S. v. Scott,* which found that although Federal

Rule of Evidence 804(b)(6)[4] did not define the word "wrongdoing," "[o]ne thing seems clear: causing a person not to testify at trial cannot be considered the 'wrongdoing' itself, otherwise the word would be redundant."  284 F.3d 758, 763 (7th Cir. 2002).  The Seventh Circuit found that "applying pressure on a potential witness not to testify, including by threats of harm and suggestions of future retribution, is wrongdoing." *Id*. at 764.  *Cf. Steele v. Taylor,* 684 F.2d 1193, 1201 (6th Cir. 1982) ("[w]rongful conduct obviously includes the use of force and threats, but it has also been held to include persuasion and control by a defendant, the wrongful nondisclosure of information, and a defendant's direction to a witness to exercise the Fifth Amendment privilege."); *Mastrangelo,* 693 F.2d at 271 (prosecution produced tape recordings in which defendant threatened murdered witness); *U.S. v. Aguiar,* 975 F.2d 45, 47 (2d Cir. 1992) (prosecution introduced a letter with defendant's fingerprints telling the witness to lie; witness also confirmed that defendants had threatened him).

However, as noted by the Second Circuit, "there is no Supreme Court caselaw definitively establishing the circumstances sufficient, or the standard of proof applicable, in analyzing waiver cases under the Confrontation Clause."  *Cotto,* 331 F.3d at 234.  Moreover, the Advisory Committee's Notes to the 1997 amendment of Federal Rule of Evidence 804(b)(6) state that "the tests for determining whether there is a forfeiture [by misconduct] have varied" among the circuits. Given the extensive federal precedent recognizing that the admission of out-of-court statements is appropriate when a defendant has threatened a witness, and the absence of "clearly established" Supreme Court law limiting the circumstances that constitute forfeiture by misconduct, the court

_____

[4]Fed. R. Evid. 804(b)(6) codified the "waiver-by-misconduct" doctrine and states: "(b) The following are not excluded by the hearsay rule if the defendant is unavailable as a witness: . . . (6) Forfeiture by wrongdoing: A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."

cannot conclude that the trial court's decision was "contrary to," or involved an "unreasonable application" of, clearly established Supreme Court law.

Thus, petitioner has failed to provide clear and convincing evidence that the trial court erred in admitting Vargas's grand jury testimony at trial. He has also failed to demonstrate that the court's determination of Vargas's altered trial testimony involved an unreasonable application of federal law or the facts of this case. Accordingly, petitioner's first claim is rejected.

## III. Prosecutorial Misconduct

Petitioner next contends that he was denied a fair trial by the prosecutor's improper comments on summation, and identifies five statements made by the prosecutor that he claims were inflammatory, irrelevant, unfair inferences from the evidence, or improper vouching for, or bolstering of, the testimony of the prosecution witnesses. The first is the prosecutor's statement that petitioner was "like a man who kills his parents and then complains that he is an orphan and throws himself on the mercy of the court." (293.) The second statement is that "something happened" between Vargas and petitioner, and that "we are never going to know exactly what was said during those conversations." (284-85.) Third, after sustained objections and the court's admonitions to move onto another topic, the prosecutor asked the jury why petitioner would "do those other things I am not supposed to tell you about." (297-98.) The fourth is that Vargas had told the "straight story" in the grand jury, and the prosecutor instructed the jury which part of Vargas's trial testimony to believe. (294.) Fifth, petitioner argues that the prosecutor improperly vouched for the credibility of the prosecution witnesses by arguing that if Lieutenant Martinez, Officer Potvin and Vargas had conspired to frame petitioner, they would have done a better job by testifying that petitioner had a gun or stolen property on his person when he was arrested. (298-301.) Finally, petitioner claims that

21

the prosecutorial misconduct was particularly egregious because the improper comments persisted throughout the summation, even after the court sustained defense counsel's objections.

Petitioner raised this claim on appeal. The Appellate Division did not specifically address the claim, but rejected it by stating, "[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit." *McClarin,* 299 A.D.2d at 495. As the Appellate Division did not disclose which argument had been rejected or on what ground, Section 2254(d)'s deferential standard does not apply to this claim. *See Miranda v. Bennett,* 322 F.3d 171, 178 (2d Cir. 2003).

"Habeas review of prosecutorial misconduct claims is narrowly circumscribed." *Tucker v. Bennett,* 219 F. Supp. 2d 260, 268 (E.D.N.Y. 2002). For the court to grant relief, a petitioner must show that the prosecutor's comments constituted more than "mere trial error," and were instead "so egregious as to violate the defendant's due process rights." *Tankleff v. Senkowski,* 135 F.3d 235, 252 (2d Cir. 1998). A petitioner must also show that he suffered "actual prejudice" in the form of "a substantial and injurious effect or influence in determining the jury's verdict." *Id*. (quoting *Bentley v. Scully,* 41 F.3d 818, 823 (2d Cir. 1994)). The Supreme Court has cautioned, however, that any evaluation of prejudicial error resulting from inappropriate prosecutorial comments must be assessed in the context of the trial as a whole. *Tucker,* 219 F. Supp. 2d at 268. " In making this evaluation, the Second Circuit has generally focused on three factors: 'the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct.'" *Id*. (quoting *U.S. v. Elias,* 285 F.3d 183, 190 (2d Cir. 2002)). After carefully reviewing the trial transcript, the court finds that the prosecutor's remarks on summation did not deprive petitioner of a fair trial.

Here, none of the prosecutor's statements on summation constituted severe prosecutorial

misconduct. To the extent there was any error in the prosecutor's remarks, it was satisfactorily cured by the trial judge's prompt action in sustaining objections and cautioning the prosecutor in front of the jury that the court would instruct on the applicable law, and the prosecutor should limit his argument to the facts in evidence. *See Tucker,* 219 F. Supp. 2d at 268. With respect to the first statement, although distastefully stated, the prosecutor was merely responding to defense counsel's argument that Vargas's differing accounts of what happened during the robbery created reasonable doubt given that the crucial issue to be determined by the jury was whether to believe Vargas's grand jury testimony or his testimony at trial. Moreover, the comment was based on the evidence presented at trial that petitioner had approached Vargas on two occasions following the robbery and begged for his help. In any event, defense counsel immediately objected to the prosecutor's statement and the trial court firmly admonished the prosecutor to, "[s]top this right now, go on to something else." (293.)

With respect to the second, third and fourth statements, petitioner claims that the prosecutor misrepresented the facts to make it appear that petitioner had used force to get Vargas to change his testimony, and improperly vouched for and bolstered the prosecution's witnesses. However, the court finds the prosecutor's remarks to have been fair comments on the evidence presented at trial and defense counsel's summation. It is undisputed that Vargas's grand jury testimony conflicted with his testimony at trial. It is similarly undisputed that petitioner approached Vargas on two occasions between the time of his testimony before the grand jury and the trial. Vargas's trial testimony was also vague regarding what petitioner said to him during the two encounters. Vargas simply testified that petitioner had pleaded with him, "Please Popi, please help me, popi, help me." (Vargas: 137-38.) Furthermore, contrary to petitioner's assertion, the prosecutor did not tell the jury

which parts of Vargas's testimony it should believe. (291.) Rather, the prosecutor argued that Vargas's grand jury testimony was the more reliable version because it took place only one week after the robbery and before petitioner had reached out to him. Therefore, in light of defense counsel's argument on summation that petitioner's pre-trial encounters with Vargas had been innocent and that Vargas's trial testimony was more reliable than his testimony before the grand jury, the prosecutor's remarks did not evidence egregious misconduct. Moreover, the court immediately sustained defense counsel's objection to the prosecutor's remark, "[w]hy would [petitioner] do those other things I am not supposed to tell you about." (297.)

Finally, petitioner claims that the prosecutor improperly vouched for the credibility of the prosecution's witnesses by arguing that if Lieutenant Martinez, Officer Potvin and Vargas conspired to frame petitioner, they would have done a better job by testifying that petitioner had a gun or stolen property on his person when he was arrested. Petitioner's claim lacks merit. The prosecutor's remarks regarding Lieutenant Martinez's and Officer Potvin's testimonies were in response to defense counsel's argument on summation that the evidence presented at trial corroborated Vargas's trial testimony. (298-301.) Defense counsel cross-examined Officer Potvin on her failure to record a description of petitioner in her memo book, and Lieutenant Martinez on his radio broadcast describing petitioner's physical characteristics, in an attempt to show that the officers had not originally considered petitioner an active participant in the robbery. (Potvin: 53-56; Martinez: 101-03, 1112-13, 123.) Defense counsel also elicited from the officers that neither of them had recovered a gun or any stolen property from petitioner's person when they arrested him and that the evidence voucher did not indicate that petitioner had possessed the watch and beeper. (Potvin: 61-67; Martinez: 113-19.) Moreover, petitioner suffered no prejudice because, in response to defense

24

counsel's objection to the word "conspiracy," the trial court advised the prosecutor to "move on," and reminded the jurors, "remember I told you it was your job to decide the credibility of the witnesses, right, and that is why I am ruling the way I am. You characterize, you decide what the facts in this case are," before telling the prosecutor to "go ahead." (301.)

Additionally, the trial court instructed the jury in detail as to the legal principles alluded to by the prosecutor, how to assess witness credibility, and that, because the attorneys' arguments on summation were not evidence, the jury should not base its verdict on them. (VD: 66; 8-11, 255-57, 312-15, 316-18, 329.) "Since the law strongly presumes that jurors follow the instructions given them by the court," petitioner cannot show that the trial court's instructions insufficiently cured the harm caused by the prosecutor's statements on summation. *Tucker,* 219 F. Supp. 2d at 268.

Finally, the court is not prepared to say that this is a case in which the evidence was so closely balanced that the prosecutor's comments were likely to have had a substantial effect on the jury. *Cf. U.S. v. Saa,* 859 F.2d 1067, 1077 (2d Cir. 1988) ("[B]ased on the other evidence against [the defendants], we find . . . that any adverse inference improperly drawn by the jury would not have tilted the scales from not guilty to guilty."). Although Vargas testified at trial that petitioner did not actively participate in the robbery, it is undisputed that he was present during the incident. Lieutenant Martinez also testified that he had seen petitioner toss something to the ground right before arresting petitioner, and that he recovered Vargas's beeper and watch near the spot where petitioner had tossed them. Moreover, during the two pre-trial encounters between petitioner and Vargas, petitioner apologized to Vargas, told him that he had been on drugs at the time, and begged for his help.

Accordingly, because petitioner fails to demonstrate that prosecutorial misconduct was so

egregious as to violate his constitutional right to a fair trial, petitioner's claim is without merit.

## IV.    Right to be Present

Petitioner also argues that his constitutional right to be present was violated because he was absent when the trial court announced additional findings regarding the *Sirois* hearing. Petitioner further contends that the trial court improperly permitted counsel to waive petitioner's presence when the trial court announced the additional findings. The Appellate Division rejected both claims stating that "[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit." *McClarin,* 299 A.D.2d at 495. Therefore, the Section 2254(d)'s deferential standard does not apply. *See Miranda,* 322 F.3d at 178. Respondent argues that petitioner had no constitutional right to be present when the trial court announced the additional findings because petitioner's absence did not impair his opportunity to defend himself at trial. The court agrees.

Here, the *Sirois* hearing evolved out of a mid-trial motion *in limine*. The prosecutor advised the court that petitioner had approached Vargas on at least three occasions to apologize and to beg him not to testify at trial. (128-29.) The prosecutor then requested a hearing outside of the presence of the jury to determine whether petitioner made admissions to Vargas that could be admitted into evidence at trial. (130.) Defense counsel concurred in the need for a hearing, and the court ordered the hearing. (131-33.) Following Vargas's testimony at the hearing about his pre-trial  encounters with petitioner, the court ruled that petitioner's statements to Vargas contained admissions, which the prosecution could present to the jury. (135-47.) The court further ruled that the prosecution could impeach Vargas with his grand jury testimony. (152-55.)

The court then determined that a *Sirois* hearing was necessary. (161-63.) The court decided to treat Vargas's testimony at the *in limine* hearing as a part of the *Sirois* hearing and took further

testimony from Vargas to "complete the hearing." (162-66.) The court also heard testimony from Detective Investigator Alvarado. (167-77.) At the conclusion of the hearing, the court found that petitioner had actively and consciously participated in threatening Vargas and ruled that the prosecution could read Vargas's grand jury testimony to the trial jury. (177-81.) Petitioner was present during the entire *in limine* and *Sirois* hearings, both of which occurred during the morning session of the second day of the trial.

The rest of the morning session was consumed by Vargas's testimony. (Vargas: 182-210.) The court remanded petitioner following Vargas's testimony. (211-12.) After lunch, but before petitioner entered the courtroom, the court made additional findings with respect to the *Sirois* hearing. (212-13.) Defense counsel agreed to waive petitioner's presence. (212.) The court stated that it had observed Vargas's demeanor and was convinced that Vargas had been in great fear during his testimony. (*Id.*) Consequently, the court found, even if petitioner had not threatened Vargas, the logic of *Sirois* would still apply where petitioner had asked the witness for sympathy. (212-13.) A discussion then ensued between counsel and the court regarding whether Vargas's grand jury testimony could be admitted as evidence-in-chief during the prosecution's case. (213-17.) The court ruled that it could, and the trial then resumed with all parties present. (217-18.)

It is a well-settled that a criminal defendant has the right "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California,* 422 U.S. 806, 819 n. 15, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). A criminal defendant's right to be present at all material stages of trial inheres in the confrontation clauses of the United States and New York Constitutions, and is articulated in both federal and state rules of procedure. *See Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) (citing U.S. Const. amend. VI; N.Y. Const. art. I, § 6;

Fed. R. Crim. P. 43; N.Y. Crim. Proc. Law §§ 260.20, 340.50 (McKinney 1993, 1994)); *see also Illinois,* 397 U.S. at 338; *People v. Parker,* 57 N.Y.2d 136, 139, 454 N.Y.S.2d 967 (1982); *People v. Mullen*, 44 N.Y.2d 1, 4-5, 403 N.Y.S.2d 470 (1978).

However, the right to be present is not absolute. *Cohen v. Senkowski,* 290 F.3d 485, 489 (2d Cir. 2002). Rather, it arises only when the defendant's "presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Id*. (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674 (1934), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)). In construing the scope of the right, the New York State Court of Appeals has held that "in the argument of a motion to decide a pure question of law, no right to be present inures to a defendant." *People v. Anderson,* 16 N.Y.2d 282, 288, 266 N.Y.S.2d 110 (1965). Similarly, federal law does not carve out any absolute right to be present during discussions of purely legal matters. *See* Fed. R. Crim. P. 43(c)(3) ("A defendant need not be present . . . when the proceeding involves only a conference or hearing upon a question of law."). Thus, the constitutional right to be present at trial applies only "to the extent that a fair and just hearing would be thwarted by [the defendant's] absence, and to that extent only." *Snyder,* 291 U.S. at 108.

Applying these principles to the instant case, petitioner has failed to show that his ability to defend himself was in anyway compromised by the trial court's announcement of additional findings regarding the *Sirois* hearing in petitioner's absence. This is not a situation where petitioner was absent when the trial court was finding facts upon which to base its legal conclusion because petitioner was present when the witnesses and evidence were presented to the jury during the underlying *Sirois* hearing. *See Clark,* 214 F.3d at 322. Rather, the portion of the trial at issue here

involved a legal discussion between counsel and the court regarding whether Vargas's grand jury testimony could be admitted as evidence-in-chief during the prosecution's case, as well as the trial court's announcement of additional findings as to the *Sirois* hearing. Petitioner could not have contributed anything meaningful to either the legal discussion or the court's announcement of additional findings.

Under these circumstances, where the benefit of petitioner's presence would have been "but a shadow," *Snyder,* 291 U.S. at 106-07, his failure to be present did not in any way "frustrate the fairness of the proceedings." *Faretta,* 422 U.S. at 819 n. 15; *see also Blanco v. Singletary,* 943 F.2d 1477, 1507 (11th Cir. 1991) (trial court did not err in making factual findings in defendant's absence which occurred outside presence of jury and related to legal ruling on pretrial motion). Given that petitioner had no constitutional right to be present during the trial court's announcement, the trial court did not err by allowing defense counsel to waive petitioner's presence. *See Polizzi v. U.S.,* 926 F.2d 1311, 1322 (2d Cir. 1991) ("Although it is certainly preferable that the waiver come from the defendant directly, there is no constitutional requirement to that effect.").

Accordingly, habeas relief is not warranted on this claim.

## V.   Ineffective Assistance of Counsel

Petitioner additionally claims that he was denied effective assistance of counsel and due process based on defense counsel's waiver of petitioner's presence during the trial court's announcement of additional findings regarding the *Sirois* hearing. Petitioner raised both claims in a motion to vacate judgment of conviction pursuant to New York Criminal Procedure Law § 440.10. The Kings Country Supreme Court denied the motion on the grounds that both claims were procedurally barred pursuant to New York Criminal Procedure Law § 440.10 (2)(c). (Resp.'s Ex. R.)

In addition, the court found the due process claim procedurally barred by New York Criminal Procedure Law § 440.10(2)(a) because it had been adjudicated on the merits during petitioner's direct appeal. (*Id*.) As such, petitioner's ineffective assistance of counsel claim is procedurally barred because the state court rejected it on an adequate and independent state procedural ground. *See Coleman v. Thompson,* 501 U.S. 722, 729-30, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Sweet v. Bennett,* 353 F.3d 135, 141 (2d Cir. 2003).

In any event, petitioner's claim is meritless. To prevail on an ineffective assistance of counsel claim, petitioner must show that counsel's representation "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Here, defense counsel's waiver of petitioner's presence was both reasonable and proper given that petitioner had no constitutional right to be present. Moreover, even assuming defense counsel's actions were deficient, petitioner's claim fails because he has not "affirmatively prove[n] prejudice." *Strickland*, 466 U.S. at 693-94. Although petitioner's due process claim is not procedurally barred given that petitioner raised the claim on direct appeal (*see* Resp.'s Ex. D at 43-47), petitioner's claim is similarly without merit because petitioner had no constitutional right to be present during the trial court's announcement of additional findings regarding the *Sirois* hearing. Therefore, the trial court did not deny petitioner due process of law by accepting defense counsel's waiver of petitioner's presence.

## VI.    Sentencing

Petitioner raises two claims with respect to his sentence. Petitioner first argues that his adjudication as a persistent violent felony offender violated his right to a trial by jury as found by the

Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Petitioner raised this claim on appeal. Although the Appellate Division did not specifically address this claim, it rejected it by stating that "[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit." *McClarin,* 299 A.D.2d at 495. As such, the deferential standard of Section 2254(d) does not apply. *See Miranda,* 322 F.3d at 178.

Petitioner's claim is groundless because petitioner had no constitutional right to a jury trial to establish the facts of his prior felony convictions. In *Apprendi*, the Supreme Court held: "*Other than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490 (emphasis added). *Apprendi*, therefore, is inapplicable on its face to a challenge, such as the one urged by petitioner here, to an increased sentence based on prior convictions. Indeed, in all post-*Apprendi* decisions in which an enhanced sentence was based on a prior conviction or convictions, the courts have held such a sentence to be valid under *Apprendi*. *See Youngblood v. Conway,* 426 F. Supp. 2d 107, 122 (W.D.N.Y. 2006); *Long v. Donnelly,* 335 F. Supp. 2d 450, 465-66 (S.D.N.Y. 2004); *Green v. Herbert,* No. 01 Civ. 11881, 2002 WL 1587133, at *20 (S.D.N.Y. July18, 2002) (citing, *inter alia U.S. v. Anglin,* 284 F.3d 407, 409-11 (2d Cir. 2002); *U.S. v. Calderon-Villeda,* 39 Fed. Appx. 640 (2d Cir. 2002); *U.S. v. Pimentel,* 27 Fed. Appx. 15, 16 (2d Cir. 2001); *U.S. v. Latorre Benavides,* 241 F.3d 262, 263-64 (2d Cir. 2001), *cert. denied,* 532 U.S. 1045, 121 S. Ct. 2031, 149 L. Ed. 2d 1014 (2001)). In any event, the sentencing court questioned petitioner about his five prior felony convictions, and petitioner admitted that he was the person so convicted. (S: 6-8.) These admissions thereby mooted any *Apprendi* issue even if *Apprendi* applied to prior convictions. *See Youngblood*, 426 F. Supp. 2d at 123.

Second, petitioner argues that his adjudication as a persistent violent felony offender violated his due process rights because it was based on inaccurate and incomplete information. On September 22, 2003, petitioner moved to set aside his sentence pursuant to New York Criminal Procedure Law § 440.20, alleging that his adjudication as a persistent violent felony officer violated New York Penal Laws §§ 70.08 and 70.04(b) because his 1984 conviction for attempted burglary was in fact a youthful offender adjudication, and his 1995 conviction for attempted robbery was vacated in 1997. The Kings County Supreme Court denied petitioner's motion on the merits because petitioner's 1984 conviction did not receive youthful offender treatment, and petitioner's probationary sentence for the 1995 conviction "was unfavorably terminated," not "vacated and dismissed." (Resp.'s Ex. L at 3.)

Respondent argues that petitioner's claim is unexhausted because petitioner's motion to set aside the sentence did not alert the state court to the federal nature of the claim. The failure to exhaust is acknowledged by petitioner, and relied on by respondent as grounds for dismissal. Before a petition for a writ of habeas corpus may be granted, the petitioner must have "exhausted the remedies available in the courts of the State."[5] 28 U.S.C. § 2254(b)(1)(A). This requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman*, 501 U.S. at 731. A claim is considered exhausted where the petitioner has "fairly presented" to the state court "both the factual and the legal premises of the claim he asserts in federal court." *Daye v. Attorney*

---

[5] The Antiterrorism and Effective Death Penalty Act of 1996 provides exceptions to the exhaustion requirement where "there is an absence of available State corrective process" or where "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B)(i)–(ii). However, these circumstances are not present in the instant petition.

*General of New York*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc). The court finds that petitioner's claim is unexhausted. However, as respondent acknowledges, it is not procedurally barred because petitioner can still raise this issue in a motion to set aside the sentence pursuant to New York Criminal Procedure Law § 440.20.[6]

The exhaustion problem may be addressed in one of three ways: (1) outright dismissal of the petition without prejudice, pursuant to *Rose v. Lundy,* 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982); (2) stay of the petition for a reasonable amount of time to enable petitioner to present his claims to the state courts and to return to federal court after exhaustion, pursuant to *Zarvela v. Artuz,* 254 F.3d 374 (2d Cir. 2001); or (3) outright denial of the petition based on the absence of any merit, pursuant to 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). With respect to staying the petition to allow petitioner to exhaust his state remedies, the Supreme Court has cautioned:

> [S]tay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless.

*Rhines v. Weber*, 544 U.S. 269, 277, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005). Indeed, as set forth below in detail, petitioner's due process claim is meritless.

The court first notes that petitioner's submissions to the court cite no case law to support his

---

[6]A motion to set aside the sentence pursuant to New York Criminal Procedure Law § 440.20 can be brought "any time after the entry of a judgment." N.Y. Crim. Pro. Law § 440.20(l).

contention that the sentencing violated his due process rights, nor did he allege that he was not given notice of the proceeding or that he was denied an opportunity to be heard. In order for petitioner to establish that his sentencing violated constitutional guarantees of due process, he would have to show that the judge relied on "misinformation of a constitutional magnitude." *Roberts v. U.S.,* 445 U.S. 552, 556, 100 S. Ct. 1358, 63 L. Ed. 2d 622 (1980) (citing *U.S. v. Tucker,* 404 U.S. 443, 447, 92 S. Ct. 589, 30 L. Ed. 2d 592 (1972)); *see Townsend v. Burke*, 334 U.S. 736, 740-741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948). In *Townsend,* the Supreme Court held that, where it was apparent from the record that either the prosecution overreached by submitting false conviction information to the sentencing judge, or that the sentencing judge had misread the record and relied upon materially false information, the defendant's sentence violated due process. 334 U.S. at 740-41. However, the Second Circuit in *United States v. Malcolm* instructs that not every defect in the sentencing process implicates the Constitution, finding no due process violation where a judge made a technical misstatement regarding the number of armed robberies of which the defendant had been convicted, as opposed to the number he had committed. 432 F.2d 809, 816 (2d Cir. 1970).

Here, the record shows that the sentencing court did not rely on inaccurate or incomplete information in passing sentence. Rather, the Kings County Supreme Court found that petitioner's 1984 conviction for attempted burglary in the second degree did not receive youthful offender treatment and that petitioner's 1995 conviction for attempted robbery in the second degree was unfavorably terminated, not vacated and dismissed. The court's factual findings are presumed to be correct, and petitioner has the burden of rebutting the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Although the court did not indicate the precise source it relied on in rendering its decision, petitioner has failed to satisfy his burden of rebutting the presumption of

correctness by clear and convincing evidence.

Accordingly, as petitioner has not shown that his sentencing as a persistent violent felony offender violated due process, his claim is denied.

## VII.    Conclusion

For the reasons set forth above, Frank McClarin's petition for a writ of habeas corpus is denied. Petitioner is further denied a certificate of appealability as he fails to make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see* Fed. R. App. P. 22(b); *Miller-El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003); *Luciadore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).

SO ORDERED.

DATED:        Brooklyn, New York
              August 9, 2007


                                    _____/s/_____
                                          DORA L. IRIZARRY
                                       United States District Judge


 _____